**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

-FILED-

| | |
|---|---|
| UNITED STATES FOR THE USE AND ) | MAR 15 2012 |
| BENEFIT OF GATLIN PLUMBING ) | |
| & HEATING, INC. and GATLIN ) | At_____M |
| PLUMBING & HEATING, INC. ) | ROBERT N. TRGOVICH, Clerk |
| ) | U.S. DISTRICT COURT |
| Plaintiff, ) | NORTHERN DISTRICT OF INDIANA |

UNITED STATES FOR THE USE AND )
BENEFIT OF GATLIN PLUMBING )
& HEATING, INC. and GATLIN )
PLUMBING & HEATING, INC. )
)
　　Plaintiff, )
)
v. )　　　Case No.:
)
WELTY BUILDING COMPANY, LTD, )
ROTH BROS. INC., CARNEGIE )
MANAGEMENT AND DEVELOPMENT )
CORPORATION, OHIO FARMER'S )
INSURANCE COMPANY. )
)
　　Defendant. )

**2 12CV 114**

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff, Gatlin Plumbing & Heating, Inc., (hereinafter "Gatlin") by counsel,

Johnson, Rappa & Ivancevich, LLC, and for its Complaint for Damages, states as follows:

## PARTIES

1.　　Gatlin is an Indiana corporation with its principal place of business in Lake County,

Indiana.

2.　　Welty Building Company, Ltd. (hereinafter "Welty") is a foreign corporation

authorized to business in the State of Indiana.

3.　　Roth Bros. Inc. (hereinafter "Roth") is a foreign corporation authorized to business

in the State of Indiana.

4.　　Carnegie Management and Development Corporation (hereinafter "Carnegie") is a

1

foreign corporation authorized to business in the State of Indiana.

5.    Ohio Farmers Insurance Company (hereinafter "Ohio Farmers") is an foreign business entity with its principal place of business in Ohio.

## JURISDICTION

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and the provisions of the Miller Act, 40 U.S.C. §3133(b)(3)(B). The Court has pendent jurisdiction and supplemental jurisdiction over state law claims alleged in the Complaint pursuant to 28 U.S.C. §1367.

## VENUE

7.    The contract(s) at issue were performed and executed in Lake County, Indiana and the relevant property is located in Lake County, Indiana. Venue therefore is appropriate in this court pursuant to 40 U.S.C. §3133(b)(3)(B) and 28 U.S.C. §1391(b)(2).

## BACKGROUND

8.    One or more of the defendants – Welty, Carnegie and/or Roth – entered into a contract as a prime contractor, and/or entered into first tier subcontracts with the nonparty, Crown Point VA Company (hereinafter "VA Clinic"), and/or a contract exists with the aforementioned parties and the nonparty, VA Clinic, and/or a contract exists with the Department of Veterans Affairs, for the construction of a clinic (hereinafter "VA Clinic Project"), with any of the Defendants, or the VA Clinic, at property commonly known as Department of Veteran Affairs Outpatient Clinic, 9301 Madison Street, Crown Point, Indiana, 46307, (which may include key no. 45-12-33-226-001.000-029) legally described by the Lake County Auditor, Assessor, Recorder and Treasurer as follows: Crownhurst Centre Unit 2 Lot 7 (Treasurer); VA Company Lot 1 (Assessor/Auditor); Lot

2

Number 1 in VA Company, a Resubdivision of Lots 5,6,7,8 and 9 of Crownhurst, Unit 2, an Addition to the City of Crown Point, as recorded in Plat Book 104, Page 33, Doc Number 2010-012645, and as previously recorded in Plat book 94, Page 3, in the office of Lake County, Indiana (Recorder), any conflict with description herein being resolved by reference to the Auditor's description.

9.     Either directly, or otherwise as defined, the VA Clinic Project is a public works project.

10.    Welty has purchased a payment bond from Ohio Farmers (hereinafter "the bond"). [The same is attached hereto as Exhibit A.]   The payment bond requires Ohio Farmers to act as surety or guarantor and pay as required by Welty to any person/subcontractor that has a contractual relationship with Welty.  On information and belief, additional payment bond(s), or the same bond and requirements, apply to claims of Gatlin against Carnegie and Roth, where the same are subcontractors subject to the bond requirement or otherwise.

11.    Gatlin and Welty entered into a contract for construction on or around January 17, 2011. [Attached hereto as Exhibit B, is the Subcontractor Agreement between Gatling Plumbing & Heating, Inc. and Welty Building Company, Ltd. (hereinafter "Welty Agreement").]

12.    Gatlin and Roth entered into a contract for construction on or around January 25, 2011. [Attached hereto as Exhibit C, is the Subcontract Agreement between Gatlin Plumbing & Heating Inc. and Roth Bros., Inc.  (hereinafter "Roth Agreement").]

13.    During the same period of construction, referring to construction pursuant to Exhibits A and B on the VA Clinic Project, Gatlin and Carnegie entered into a contract for construction concerning the same VA Clinic Project.

3

14.     The Defendants, Welty, Carnegie and Roth, collectively, failed to pay an amount of around, or approximately, $81,524.00 of the original contract(s) price. This failure to pay for services per contract is as follows: Welty failed to pay an amount equal to $20,624.00, per the terms of the Welty Agreement; Roth failed to pay an amount equal to $57,015.00, per the terms of the Roth Agreement; Carnegie failed to pay an amount equal to $3,875.00, per the terms of Carnegie and Gatlin's contract.

15.     Gatlin has submitted a claim against the bond for the entire amount of the outstanding balance – for amounts due from Roth, Welty and/or otherwise – and Ohio Farmers has failed to pay.

16.     It has been over 120 days since work was performed regarding the VA Clinic Project by Gatlin; payment under law was due within a reasonable time, regardless of any contractual language regarding pay-when-paid or otherwise.

<u>**COUNT I:   MILLER ACT CLAIM FOR PAYMENT BOND**</u>

17.     Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 16 as if fully set forth herein.

18.     On information or belief the contractor(s) Welty, Carnegie and/or Roth have a contract with the owner of the property at issue, VA Clinic, or another entity identified in the Prime Contract, or otherwise, and, per the intent of the parties to that agreement, Gatlin, is a third-party beneficiary entitled to brings claims against the Ohio Farmers or otherwise.

19.     On information or belief the owner of the property at issue, VA Clinic or the Department of Veterans Affairs, has withheld funds, placed funds in escrow and/or has required bonds from contractor(s) Welty, Carnegie and/or Roth for which Gatlin is a beneficiary and is required payment therefrom.

4

20.     Specifically, Ohio Farmers is a surety/guarantor, who is bound to pay under a payment bond issued to at least, but not limited to, Welty and/or Roth and the same surety was given notice as required and is liable for payment for the outstanding principle as described above, including all unpaid and outstanding balances in accordance with the terms of bound and according to law. [See Ex. A].

21.     All conditions precedent to payment of the payment bond, regarding the demands of Gatlin, have been fulfilled, or are not applicable under Indiana law, including that pay-when-paid clauses which clauses are only effective for a reasonable time, and Gatlin is entitled to payment from the surety/bond at present.

**WHEREFORE**, Plaintiff, Gatlin, demands a judgment against Ohio Farmers in the amount of the remaining balance of Gatlin's respective contracts with Welty, Carnegie and Roth, as applicable, plus pre and post judgment interest, costs, fees and all other just and proper relief in the premises.

## COUNT II: BREACH OF CONTRACT REGARDING WELTY CONTRACT, CARNEGIE CONTRACT AND ROTH CONTRACT

22.     Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 21 as if fully set forth herein.

23.     The contract price, as illustrated in Exhibit B and C, and also orally, or otherwise, with regard to Carnegie, and including change orders and/or other extras as may apply, has not been paid in full by Defendants Carnegie, Roth and Welty, despite performance by Gatlin.

24.     Failure to pay the contract price, regarding Exhibits B and C, or other contracts and changes, after completion of the work to be performed, as outline in the respective contracts, constitutes a breach of contract.

5

25.     Gatlin has made several attempts to collect the debt and/or solicit payment for the debt to no avail.

**WHEREFORE**, Plaintiff demands a judgment against the Defendants, Welty, Carnegie and Roth, in the amount of the remaining balance of Gatlin's respective contracts with Welty, Carnegie, and Roth, plus pre and post judgment interest, costs, fees and all other just and proper relief in the premises.

### COUNT III: UNJUST ENRICHMENT AND QUANTUM MERUIT

26.     Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 25 as if fully set forth herein.

27.     The Defendants, collectively and individually, have received a benefit from the work performed by Gatlin.

28.     Gatlin has been harmed or received a detriment by performing services that were uncompensated, or not compensated for at a fair value.

29.     Gatlin requires compensation in a reasonable amount from the Defendants,  in proportion to the uncompensated benefit received, otherwise the same constitutes unjust enrichment.

**WHEREFORE**, Plaintiff, Gatlin demands a judgment against the Defendants, Welty, Roth and Carnegie, in the amount of Gatlin's contracts, including change orders and extras, representing fair market value of their services, plus pre and post judgment interest, costs, fees and all other just and proper relief in the premises.

### COUNT IV: ACCOUNTS STATED (ROTH AND WELTY)

30.     Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 29 as if fully set forth herein.

6

31.     Attached here to as Group Exhibits D and E are invoices sent to Roth and Welty, respectively, indicating invoiced amounts of $20,637.00, for Welty and $57,015.00, for Roth.

32.     The invoices, Ex. D and E, were sent as they accrued and Roth and Welty failed to object to any of the amounts therein.

**WHEREFORE**, Plaintiff demands a judgment against the Defendants in the amount of their respective outstanding invoices representing fair market value of their services, plus pre and post judgment interest, costs, fees and all other just and proper relief in the premises.

Respectfully Submitted,

**JOHNSON, RAPPA & IVANCEVICH, LLC**

**By: STEVEN A. JOHNSON**
Attorney No.  4940-45
**By: COLBY A. BARKES**
Attorney No. 26251-64
250 East 90th Drive
Merrillville, IN  46410
Phone: (219) 769-0087
Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I certify that on this 14th day of March, 2012, service of a true and complete copy of the above and foregoing pleading or paper was made upon each party or attorney of record herein by depositing the same in the United States mail in envelopes properly addressed to each of them with sufficient first class postage affixed.

**JOHNSON, RAPPA & IVANCEVICH, LLC**

By:

*6/229120314.federal complaint.wpd*

**Performance**
**Bond**

# Ohio Farmers Insurance Co.

Westfield Group ℠
Westfield Center, Ohio 44251-5001

Bond No. 5881243

### KNOW ALL MEN BY THESE PRESENTS:

That  Welty Building Company, Ltd., 3421 Ridgewood Road, Suite 300, Westlake, Ohio 44145

(Insert name and address, or legal title, of contractor)

as Principal, hereinafter called Contractor, and OHIO FARMERS INSURANCE COMPANY, an Ohio Corporation, with principal office at Westfield Center, Ohio, as Surety, hereinafter called Surety, are held and firmly bound unto
Crown Point VA Company, LLC

27500 Detroit Road, Suite 300, Westlake, Ohio 44145

(Insert name and address, or legal title, of owner)
as Obligee, hereinafter called Owner in the amount of  twelve million, one hundred ten thousand, eight hundred thirty eight, &64/100--

Dollars ($ 12,110,838.64                                                                                    )
for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Contractor has by written agreement dated  October 2, 2009 / Construction State Date June 17, 2010
entered into a Contract with Owner for  Construction of Crown Point VA Outpatient Clinic

in accordance with drawings and specifications prepared by  Westlake Reed Leskosky

(Insert full name and title)
which Contract is by reference made a part hereof, and is hereinafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Contractor shall promptly and faithfully perform said Contract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligation thereunder, the Surety may promptly remedy the default, or shall promptly

      (1)  Complete the Contract in accordance with its terms and conditions, or

      (2)  Obtain a bid or bids for submission to Owner for completing the Contract in accordance with its terms and conditions, and upon determination by Owner and Surety of the lowest responsible bidder, arrange for a contract between such bidder and Owner and make available as work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term "balance of the contract price", as used in this paragraph, shall mean the total amount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor.

Any suit under this bond must be instituted before the expiration of two (2) years from the date on which Contractor ceases work on the Contract.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein or the heirs, executors, administrators or successors of Owner.

Signed this_____17th_____ day of  June_____ , 2010_____ .

Welty Building Company, Ltd.
Principal

By: _____  CEO

OHIO FARMERS INSURANCE COMPANY

By: _____        Attorney-in-Fact
    Charles R. Davis

BD 5047OF  (01-2000)


**EXHIBIT**
**A**

**THIS BOND ONLY COVERS CLAIMS OF SUBCONTRACTORS, SUPPLIERS, AND LABORERS TO THE EXTENT THE PRINCIPAL HAS BEEN PAID FOR THE LABOR, SERVICES OR MATERIALS PROVIDED BY SUCH PERSONS.**

# Ohio Farmers Insurance Co.

Westfield Group ℠ One Park Circle, P O Box 5001
Westfield Center, Ohio 44251-5001

Labor and Material
Payment Bond

Bond No. 5881243

**NOTE: THIS BOND IS ISSUED SIMULTANEOUSLY WITH ANOTHER BOND IN FAVOR OF THE OWNER CONDITIONED FOR THE FULL AND FAITHFUL PERFORMANCE OF THE CONTRACT.**

KNOW ALL MEN BY THESE PRESENTS:

That  Welty Building Company, Ltd., 3421 Ridgewood Road, Suite 300, Westlake, Ohio 44145

(Here insert the name and address, or legal title, of the contractor)

as Principal, hereinafter called Principal, and OHIO FARMERS INSURANCE COMPANY, an Ohio Corporation with Principal Office at Westfield Center, Ohio, as Surety, hereinafter called Surety, are held and firmly bound unto _____

Crown Point VA Company, LLC, 27500 Detroit Road, Suite 300, Westlake, Ohio 44145

(Here insert full name and address, or legal title, of the owner)

as Obligee, hereinafter called Owner, for the use and benefit of claimants as herein below defined, in the amount of _____

twelve million, one hundred ten thousand, eight hundred thirty eight, and 64/100————————————

Dollars ($ 12,110,838.64           ), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated  October 2, 2009 / Construction Start Date June 17, 2010

entered into a Contract with Owner for  Construction of Crown Point VA Outpatient Clinic

in accordance with drawings and specifications prepared by  Westlake Reed Leskosky

(Here insert full name and title)

which Contract is by reference made a part hereof, and is hereafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1.    A claimant is defined as one having a direct contract with the Principal or with a subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil gasoline, telephone service or rental of equipment directly applicable to the Contract.

2.    The above named Principal and Surety hereby jointly and severally agree with the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant in the name of the Owner, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon; provided, however, that the Owner shall not be liable for the payment of any costs or expenses of any such suit.

3.    No suit or action shall be commenced hereunder by any claimant,

(a)  Unless claimant shall have given written notice to the Surety above named, within ninety (90) days after such claimant did or performed the last of the work of labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed.  Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelope addressed to the Surety, at Westfield Center, Ohio 44251.

(b)  After the expiration of one (1) year following the date on which Claimant ceased work on said Contract.

(c)  Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere.

4.    The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of mechanics liens which may be filed of record against said improvements, whether or not claim for the amount of such lien be presented under and against this bond.

Signed this _____17th_____ day of ___June_____ , ___2010_____ .

OHIO FARMERS INSURANCE COMPANY                    Welty Building Company, Ltd.                    (Seal)

By _____            By _____            Principal
    Charles R. Davis,              Attorney-in-Fact                                      CEO

BD 5048  (2-2004)

Additional Obligee Rider
Performance and/or
Payment and/or
Maintenance Bond(s)

# Ohio Farmers Insurance Company

Westfield Insurance®
1 Park Circle, PO Box 5001
Westfield Center, Ohio 44251-5001

Bond No. 5881243

WHEREAS, Heretofore, and on or about the 2nd _____ day of October _____ 2010 _____,
Welty Building Company, Ltd., 3421 Ridgewood Road, Suite 300, Westlake, Ohio 44145 _____ as Principal
entered into a written agreement with Crown Point VA Company, LLC _____
27500 Detroit Road, Suite 300, Westlake, Ohio 44145 _____ as Obligee
for Construction of Crown Point VA Outpatient Clinic _____ in accordance with drawings and
specifications prepared by Westlake Reed Leskosky _____.
herein referred to as the Contract, and WHEREAS, The Principal and Ohio Farmers Insurance Company _____ , as Surety,
made, executed and delivered to said Obligee their joint and several Performance and/or Payment and/or Maintenance Bond(s).

NOW, THEREFORE, in consideration of One Dollar and other good and valuable considerations, receipt of which is hereby
acknowledged, the undersigned hereby agree as follows:

The Performance and/or Payment and/or Maintenance Bond(s) aforesaid shall be and is (are) hereby amended to add
United States of America, acting through the Secretary of the Department of Veterans Affairs _____
to said bond(s) as named Additional Obligees(s).  The rights of the Additional Obligee(s) hereunder are conditioned upon the
following:

1.  Neither the Surety nor the Principal shall be liable under this bond to the Obligees, or any of them, unless the said
    Obligees shall make payments to the Principal strictly in accordance with the terms of said contract as to payments and
    shall perform all the other obligations to be performed under said contract at the time and in the manner therein set forth.
2.  If an Additional Obligee is a mortgagee, any change or alteration increasing the contract price shall not be subject to
    the terms of this rider unless sufficient money has been deposited with the Obligees to cover any such increase and
    consent of Surety has been obtained.
3.  There shall be no recovery hereunder by an Additional Obligee for any loss resulting from the failure of any of the
    Obligees or someone acting on their behalf to obtain sufficient insurance.
4.  The aggregate liability of the Surety hereunder to the Obligees is limited to the penal sum set forth in the bond,
    and the Surety, upon making any payment hereunder, shall be subrogated to, and shall be entitled to an assignment
    of, all rights of the payees, either against the Principal or against any other party liable to the payee in connection
    with the loss which is the subject of the payment.
5.  Except as herein modified, said Performance and/or Payment and/or Maintenance Bond(s) shall be and remain in full
    force and effect.

SIGNED THIS 17th _____ day of June _____, 2010 _____.

Welty Building Company, Ltd.

By: _____ Principal _____ CEO

Ohio Farmers Insurance Company

By: _____

Charles R. Davis                                    Attorney-In-Fact

BD 5057OFWWN  (11-2006)

'THIS POWER OF ATTORNEY SUPERCEDES ANY PREVIOUS POWER BEARING THIS SAME
POWER # AND ISSUED PRIOR TO 07/05/06, FOR ANY PERSON OR PERSONS NAMED BELOW.

**General**
**Power**
**of Attorney**

CERTIFIED COPY

POWER NO. **3410722 01**

# Westfield Insurance Co.
# Westfield National Insurance Co.
# Ohio Farmers Insurance Co.
Westfield Center, Ohio

*Know All Men by These Presents,* That WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY, corporations, hereinafter referred to individually as a "Company" and collectively as "Companies," duly organized and existing under the laws of the State of Ohio, and having its principal office in Westfield Center, Medina County, Ohio, do by these presents make, constitute and appoint
**CHARLES R. DAVIS, TWILLA M. STOLER, KURT A. MELLON, JOINTLY OR SEVERALLY**

of **AKRON**                    and State of **OH** its true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver **any and all bonds, recognizances, undertakings, or other instruments or contracts of suretyship-** - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**LIMITATION: THIS POWER OF ATTORNEY CANNOT BE USED TO EXECUTE NOTE GUARANTEE, MORTGAGE DEFICIENCY, MORTGAGE GUARANTEE, OR BANK DEPOSITORY BONDS.**
and to bind any of the Companies thereby as fully and to the same extent as if such bonds were signed by the President, sealed with the corporate seal of the applicable Company and duly attested by its Secretary, hereby ratifying and confirming all that the said Attorney(s)-in-Fact may do in the premises. Said appointment is made under and by authority of the following resolution adopted by the Board of Directors of each of the WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY:
"*Be It Resolved,* that the President, any Senior Executive, any Secretary or any Fidelity & Surety Operations Executive or other Executive shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:
*The Attorney-in-Fact,* may be given full power and authority for and in the name of and on behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements of indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be as binding upon the Company as if signed by the President and sealed and attested by the Corporate Secretary."
"*Be It Further Resolved,* that the signature of any such designated person and the seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signatures or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached." (Each adopted at a meeting held on February 8, 2000).
*In Witness Whereof,* WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY have caused these presents to be signed by their **Senior Executive** and their corporate seals to be hereto affixed this **05th** day of **JULY**       A.D., 2006 .

Corporate
Seals
Affixed



WESTFIELD INSURANCE COMPANY
WESTFIELD NATIONAL INSURANCE COMPANY
OHIO FARMERS INSURANCE COMPANY

By:
**Richard L. Kinnaird, Jr.,** *Senior Executive*

State of Ohio
County of Medina        ss.:

On this **05th** day of **JULY**       A.D., 2006 , before me personally came **Richard L. Kinnaird, Jr.** to me known, who, being by me duly sworn, did depose and say, that he resides in **Medina, Ohio**; that he is **Senior Executive** of WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY, the companies described in and which executed the above instrument; that he knows the seals of said Companies; that the seals affixed to said instrument are such corporate seals; that they were so affixed by order of the Boards of Directors of said Companies; and that he signed his name thereto by like order.

Notarial
Seal
Affixed

State of Ohio
County of Medina        ss.:

**William J. Kahelin,** Attorney at Law, *Notary Public*
My Commission Does Not Expire (Sec. 147.03 Ohio Revised Code)

I, **Frank A. Carrino,** Secretary of WESTFIELD INSURANCE COMPANY, WESTFIELD NATIONAL INSURANCE COMPANY and OHIO FARMERS INSURANCE COMPANY, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Companies, which is still in full force and effect; and furthermore, the resolutions of the Boards of Directors, set out in the Power of Attorney are in full force and effect.

*In Witness Whereof,* I have hereunto set my hand and affixed the seals of said Companies at Westfield Center, Ohio, this 17th day of August     A.D.,   2010 .

 

**Frank A. Carrino,** *Secretary*

**BPOAC2 (combined) (06-02)**

Office of Financial
Regulation Services
50 West Town Street
Third Floor- Suite 300
Columbus, Ohio 43215
(614) 644-2658
Fax (614) 644-3256
www.ohioinsurance.gov

**Ohio Department of Insurance**

Ted Strickland - Governor
Mary Jo Hudson - Director

**Certificate of Compliance**



| | |
|---|---|
| Issued | 06/29/10 |
| Effective | 07/01/10 |
| Expires | 06/30/11 |

I, Mary Jo Hudson, hereby certify that I am the Director of Insurance in the State of Ohio and have supervision of insurance business in said State and as such I hereby certify that

### OHIO FARMERS INSURANCE COMPANY

of   Ohio   is duly organized under the laws of this State and is authorized to transact the business of insurance  under the following section(s) of the Ohio Revised Code:

Section 3929.01 (A)

| | |
|---|---|
| Accident & Health | Medical Malpractice |
| Aircraft | Multiple Peril - Commercial |
| Allied Lines | Multiple Peril - Farmowners |
| Boiler & Machinery | Multiple Peril - Homeowners |
| Burglary & Theft | Noncancellable A & H |
| Collectively Renewable A & H | Nonrenew - State Reasons (A&H) |
| Commercial Auto - Liability Other | Ocean Marine |
| Commercial Auto - No Fault | Other Accident only |
| Commercial Auto - Phys. Damage | Other Liability |
| Credit Accident & Health | Private Passenger Auto - No Fault |
| Earthquake | Private Passenger Auto-Liability Other |
| Fidelity | Private Passenger-Phys Damage |
| Financial Guaranty | Surety |
| Fire | Workers Compensation |
| Glass | |
| Group Accident & Health | |
| Guaranteed Renewable A & H | |
| Inland Marine | |

OHIO FARMERS INSURANCE COMPANY certified in its annual statement to this Department as of December 31, 2009 that it has admitted assets in the amount of  $1,504,224,686, liabilities in the amount of $264,070,585, and surplus of at least  $1,240,154,101.

IN WITNESS WHEREOF, I have hereunto subscribed my name and caused my seal to be affixed at Columbus, Ohio, this day and date.

Mary Jo Hudson

Director

Accredited by the National Association of Insurance Commissioners (NAIC)

**Financial
Statement**

# Ohio Farmers Insurance Co.

December 31, 2009                           Westfield Center, Ohio 44251-5001

*(in thousands)*

## ASSETS

| | |
|---|---:|
| *Cash, cash equivalents, and short term investments* | $ 32,940 |
| *Bonds* | 180,611 |
| *Stocks, unaffiliated* | 32,129 |
| *Stocks, affiliated* | 1,029,616 |
| *Real estate* | 61,264 |
| *Agents' balances and uncollected premiums, net* | 44,121 |
| *Interest and dividends accrued* | 1,946 |
| *Other admitted and intangible assets* | 121,598 |
| *Total admitted assets* | $1,504,225 |

## LIABILITIES

| | |
|---|---:|
| *Reserve for unearned premiums* | $ 63,871 |
| *Reserve for unpaid losses and loss expenses* | 116,465 |
| *Reserve for taxes and other liabilities* | 83,735 |
| *Total liabilities* | 264,071 |

## SURPLUS

| | |
|---|---:|
| *Capital stock* | 0 |
| *Other than special surplus funds* | 1,553 |
| *Surplus* | 1,238,601 |
| *Total surplus* | 1,240,154 |
| | |
| *Total liabilities and surplus* | $1,504,225 |

State of Ohio

    ss:

County of Medina

The undersigned, being duly sworn, says: That he is National Surety Leader - Surety Operations of Ohio Farmers Insurance Company, Westfield Center, Ohio; that said Company is a corporation duly organized, existing and engaged in business as a Surety Company by virtue of the Laws of the State of Ohio and authorized to do business in the State of ....Ohio................................. and has duly complied with all the requirements of the laws of said State applicable to said Company and is duly qualified to act as Surety under such laws; that said Company has also complied with and is duly qualified to act as Surety under the Act of Congress approved July 1947, 6 U.S.C. sec. 6-13; and that to the best of his knowledge and belief the above statement is a full, true, and correct statement of the financial condition of the said Company on the 31st day of December, 2009.

Attest:

*Frank Carrino* (signature)
...................................................
Frank A. Carrino
Group Legal Leader, Secretary

*Richard L. Kinnaird, Jr.* (signature)
..........................................................
Richard L. Kinnaird, Jr.
National Surety Leader
Surety Operations

Sworn to before me this 10th day of February A.D. 2010.

*William J. Kahelin* (signature)
.........................................................
William J. Kahelin
Attorney at Law
Notary Public – State of Ohio

My Commission Does Not Expire
  Sec. 147.03 Ohio Revised Code

BD 5402 B

# Proof of Claim
## Construction Contract

Bond No.    5881243    is provided by:

**Ohio Farmers Insurance Company**
Westfield Center, Ohio 44251-5001
(Herein called the Surety)

State of _Indiana_

County of _Lake_

I, _____Clara Murphy_____ the Sec./Treasurer of _Gatlin Plumbing & Heating Inc._
     Name of Affiant                       Title                  Name of Claimant

of _1111 East Main St. Griffith, Indiana 46319_ on behalf of said firm, hereby state
                 Address

under oath that said firm between the dates of _12/2_ / _10_ and _9_ / _30_/_11_ furnished, sold and

delivered _Gas Line & Mechanical_ to _Piping_ _WeltyBuilding Co. LTD. / Rothe. Bros._ for the construction
     Described services or material              Name of Contractor and/or Subcontractor if any

of _Crown Point VA Company_ in accordance with a ☒ Subcontract or ☐ Purchase Order, dated
                LLC
                Identify contract

_1_ / _Welty_ / _11_, a copy of which is attached hereto, for the agreed price of $_423,853.00_ , none of
    Roth 1/17/11

which has been paid except $_346,204.00_ leaving a balance due of $ _77,649.00_ ; that attached
                State total paid

hereto are ☒ invoices, ☐ delivery tickets and a statement showing the deliveries or progress estimates

furnished _Welty Building Company_ and the amount due to claimant therefor; that said firm served
     Contractor/subcontractor          &Roth Bros

notice of said balance due it by Registered Mail dated _12_/ _14_/_11_ on ☒ Surety, ☐ Contractor,

☐ Owner, (copies attached); that there is no just credit nor offset due against said balance, and that

said firm made no assignment of any part of said balance except to _Gatlin Plumbing & Heating_

that there are no liens or encumbrances against said balance except that of _N/A_ ;

and that said firm has paid in full for all labor and material furnished and supplied to it for said job except

the claims of the persons or firms whose names and addresses and amounts due to them are as follows,

| | |
|---|---|
| Mechanical Test & Balance, Inc. | $800.00 |
| P.O. BOX 1157 Crown Point, Indiana    46308 | |

The above information is furnished to the Surety in support of affiant's claim and it is understood that the furnishing of this form or the acceptance and/or retention thereof by the Surety does not constitute a waiver of any of the terms of the Surety's bond nor of any defenses the Surety may have, nor an admission of liability thereunder.

Sworn to and subscribed before me this

_14_ day of _December_ , 20_11_.

_Patricia Centkoski_
Notary Public

_Clara Murphy_
Affiant's signature

**(ALL BLANKS MUST BE FILLED IN OR FORM WILL BE RETURNED)**

OHIO LAW REQUIRES US TO NOTIFY YOU OF THE FOLLOWING: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**PATRICIA CENTKOWSKI**
Notary Public, State of Indiana
Newton County
My Commission Expires
October 02, 2017

Westfield Group

BD 5711 (3-01)

**RECEIVED**

**FEB 0 9 2011**

**WELTY BUILDING COMPANY LTD.**



**WELTY**
**BUILDING**
**COMPANY LTD.**
ESTABLISHED 1945

3421 Ridgewood Road, Suite 200, Fairlawn, OH 44333
Telephone (330) 867-2400   FAX: (330) 864-4566

# SUBCONTRACT AGREEMENT

| | | | |
|---|---|---|---|
| SUBCONTRACT NO: | 09-0945-036A | **PROJECT ADDRESS:** | **9301 Madison Street** |
| Cost Code: | 700 - 15700 | | **Crown Point, IN  46307** |

**JOB TELEPHONE:**   219-663-6470   **FAX:**   219-663-6471   **SUPERINTENDENT:**   **Tom Reese**

THIS SUBCONTRACT AGREEMENT ("Subcontract") made the (i) **25th day of January, 2011** by and between Welty Building Company Ltd., an Ohio limited liability company, hereinafter called the "Contractor," and **Gatlin Plumbing & Heating, Inc.**

Address:    1111 East Main Street
Griffith, IN  46319-2897

Phone: 219-924-6972          FAX:  219-924-1401          Contact:  Matt Hase
herein called the "Subcontractor," for the construction of:  **VA Crown Point Indiana**
(the "Project"), at       9301 Madison Street
Crown Point, IN  46307

## THE CONTRACTOR AND SUBCONTRACTOR HEREBY AGREE AS FOLLOWS:

### ARTICLE 1.    Contract Documents

The "Contract Documents" for this Subcontract consist of this document and any Exhibits attached hereto, and, where applicable: (a) the "Prime Contract," consisting of the Agreement between the Owner and Contractor, dated the 2nd day of October, 2009 the other Contract Documents enumerated therein or in the A201, hereinafter defined, (collectively "Contract Documents") and all Conditions (General, Special, Supplementary, etc.), and modifications thereto; (b) Addendum N/A; (c) Preconstruction Bulletin N/A; (d) Exhibits A; (e) Welty Building Company Ltd.'s Scope of Work Book dated 4/14/2010 (f) all plans and specifications (the "Plans") depicting the Project; (g) the Schedule, hereinafter defined; and (h) American Institute of Architects Document No. A201: General Conditions of the Contract for Construction-2007 Edition (the "A201").  Except for the Schedule, which shall be established by the Contractor and made available to the Subcontractor thereafter, and except for the Prime Contract, the Subcontractor acknowledges receipt of copies of the Contract Documents.  The Architect as used herein, shall refer to **Westlake Reed Leskosky, 925 Euclid Avenue, Suite 1900, Cleveland, OH  44115.** Capitalized terms not otherwise defined in this document shall have the same meaning ascribed to them in the Contract Documents.  In case of conflict between the terms of this Subcontract and any of the other Contract Documents, this Subcontract shall control.

### ARTICLE 2.    Description of Work and the Subcontract Time.

In strict conformity with every portion of the Plans and all other Contract Documents, the Subcontractor agrees to furnish labor, materials, tools and equipment and do all things necessary to complete:

**HVAC Gas Line System**

(the "Subcontractor's Work;" the Subcontractor's Work, together with the labor, materials, tools and equipment furnished by the Contractor or any other subcontractor with respect to the Project is hereinafter referred to as "Work").  The time within which the Subcontractor shall complete Subcontractor's Work (the "Subcontract Time") shall be determined as provided in Article 10 hereof.

### ARTICLE 3.    Subcontract Sum

The Contractor shall pay the Subcontractor in current funds for the satisfactory performance of Subcontractor's Work, subject to additions and deductions as provided in the Contract Documents, the total sum of: **Twenty four thousand and 00/100** dollars (**$24,000.00** U.S. ).

Revised 04/16/10



**EXHIBIT**
**B**

Subcontract Sum, from which shall be deducted: (i) retainage of ten percent (10%) ("Retainage"); (ii) all previous payments to Subcontractor toward the Subcontract Sum; and (iii) all other charges to Subcontractor for material or service furnished by Contractor or chargeable to Subcontractor, and the net amount of said Payment Request. When Contractor and Architect have approved a Payment Request, the net amount thereof shall be paid to Subcontractor within five (5) days after the date that Contractor receives payment from the Owner corresponding to the portion of the Subcontractor's Work to which the Payment Request relates. Receipt by the Contractor of such payment from the Owner is a condition precedent to the Contractor's obligation to make any corresponding payment to the Subcontractor.

Payment of any Retainage shall be made to Subcontractor upon the completion by Subcontractor of Subcontractor's Work and the acceptance thereof by the Owner, and is further conditioned upon receipt by Contractor of Owner's final and unconditional payment for such Subcontractor's Work. Contractor shall act as agent for the Owner for the limited purpose under this Article 6 of facilitating collection of the Subcontract Sum from the Owner, and making payment thereof to the Subcontractor. Such agency shall in no way affect the rights of the parties under Article 5, or any other provision of this Subcontract and this limited designation of agency shall not be construed to relieve Contractor of any of its obligations to Subcontractor that are set forth in this Subcontract.

Prior to final payment and prior to monthly progress payments, Subcontractor shall execute and deliver to Contractor an agreement in form satisfactory to the Contractor, releasing and holding Contractor, the Project and the Owner harmless from all claims arising out of or in connection with this Subcontract, including, without limitation, mechanic's lien claims with respect to work, labor or materials.

If at any time, as determined by the Contractor in its sole discretion: (i) there shall be asserted any lien or claim for which the Contractor, the Owner or the Project might become liable and which is or may be chargeable to Subcontractor; (ii) damage shall be caused by Subcontractor to the Project or the Work of the Contractor or of any other subcontractor; (iii) there occurs any of the events described in Article 12 of this Subcontract, regardless of whether or not: (a) any of the notices described in Article 12 have been issued to the Subcontractor; (b) the Contractor has exercised any of the rights granted to the Contractor under Article 12; or (c) this Subcontract is terminated under Article 13 or otherwise; or (iv) the Subcontractor is otherwise in breach of this Subcontract, the Contractor shall have the right to retain out of any payment then due or thereafter to become due to Subcontractor an amount sufficient to indemnify itself, the Owner or the Project, as the case may be, for any loss or damage, including legal fees and other disbursements which any of them may sustain on account thereof. Subcontractor shall reimburse to Contractor all monies that Contractor or Owner shall pay discharging such lien or claim against the Project, or otherwise on account of any of the foregoing, and all expenses incurred in connection therewith.

No payment made under this Subcontract shall be conclusive of the performance by Subcontractor of this Subcontract, either wholly or in part; and no payment, including final payment, shall be construed to be an acceptance of defective Subcontractor's Work, nor shall entrance and use of the Project by Owner constitute acceptance for Subcontractor's Work hereunder or any part thereof.

In addition to its other remedies, Contractor may make checks jointly payable to Subcontractor and any one or more of Subcontractor's materialmen, suppliers, laborers, or any other party who has, or claims to have, a right to payment on account of the Subcontractor's performance of Subcontractor's Work, and Contractor may ,from time to time, withhold and retain out of monies due Subcontractor hereunder, amounts sufficient, as determined by the Contractor in its sole discretion, to fully reimburse and compensate itself for any loss or damage which it sustains, or may sustain, as a result of any default or any breach of any of the provisions of this Subcontract by the Subcontractor.

## ARTICLE 7.    Indemnity.

The Subcontractor shall indemnify the Contractor, the Architect and the Owner and save them harmless from damage, and from all claims and judgments for injury or death to persons or property damage, including costs of litigation and attorney's fees, made or obtained against Contractor, Architect, or Owner by third persons, including Owner's other contractors and subcontractors, their employees and agents, based on injuries to person or property, in any manner caused by, incident to, connected with, resulting or arising from the performance of this Subcontract or the presence of Subcontractor's employees, subcontractors and/or agents at the Project, but the Subcontractor will not be responsible for loss, damage or injury, including death, caused by the negligence of the Contractor or Owner or their respective employees.

## ARTICLE 8.    Insurance.

8.1      Owner's Insurance. Unless otherwise provided, the Owner shall purchase and maintain the Owner's usual liability insurance, and the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form, to cover all of the Subcontractor's Work in the course of the construction of the Project at the Project site or elsewhere, including false work, temporary buildings and structures and materials used in the construction process, to the full replacement cost thereof. This insurance shall include the interests of the Owner, the Contractor and the Subcontractor in the Project, and shall provide coverage on a special perils basis insuring against the physical loss of or damage to covered property including, without limitation, theft, vandalism, malicious mischief, tornado, lightning, explosion, breakage of glass, flood (if the Project is in a special flood hazard area as determined by the Federal Emergency Management Administration), collapse, water damage and hot and cold testing. It shall also include debris removal, and demolition occasioned by enforcement of any applicable legal requirement. If such

### ARTICLE 9.    Bonds

The Subcontractor further agrees that it will furnish unto the said Contractor, a good sufficient surety bond issued by a bonding company acceptable to the Contractor in the amount of _____None_____(U.S. $_____-0-_____) conditioned upon the faithful performance of this Subcontract for the prompt and proper completion of Subcontractor's Work, for the payment of all labor and material bills and for such other obligations and provisions as required by the Owner or the Contractor under the Contract Documents or otherwise.

### ARTICLE 10.    Changes in Subcontractor's Work

No terms or conditions, other than those stated herein, and no agreement or understanding in any way modifying the terms and conditions herein stated, shall be binding upon the Owner or the Contractor unless made in writing and signed by Contractor. Written Field Orders properly signed by the Contractor's Superintendent or Project Manager are proper authorization to proceed with Work. Verbal orders are not binding on the Contractor. Whenever a Construction Change Directive is issued by the Owner due to the absence of total agreement on the terms of a Change Order, the Subcontractor shall proceed with the change subject to the terms and conditions outlined in the Contract Documents.

All clauses of this Subcontract shall apply to any changes, additions, deviations, omissions, or extra Work in like manner, and to the same extent as to Subcontractor's Work contracted for. Additional Work authorized by the Contractor shall be charged at cost for material plus 5% for overhead and profit, at cost for labor including fringes, taxes and insurances plus 5% for overhead and profit, and for equipment, including fuel, at the then current Associated Equipment Dealers (AED) Green Book Rental Rates utilizing the monthly rates, and includes fuel. The cost of small tools and equipment with a value of under $1,000 shall be deemed to be included in the 5% surcharge allocated to overhead and profit.

At all times during performance of this Subcontract, including without limitation any dispute resolution process, the Subcontractor shall continue with Subcontractor's Work as directed, in a diligent manner and without delay, or shall conform to the Contractor's or Owner's decisions or orders, and shall be governed by all applicable provisions of the Contract Documents. Records of Subcontractor's Work shall be kept by Subcontractor in sufficient detail to enable payment to Subcontractor within the applicable provisions of the Contract Documents.

### ARTICLE 11.    Scheduling of Work

It is expressly understood and agreed by and between the parties hereto that time is and shall be considered of the essence of this Subcontract on the part of the Subcontractor.

The Subcontractor shall perform and coordinate the Subcontractor's Work according to the Contractor's Construction Schedule, as that term is defined in the A201 ("Schedule") prepared by the Contractor, and agrees to adhere to such Schedule, and shall carry on Subcontractor's Work promptly and efficiently as necessary to avoid causing delay in completion of the Project. If necessary, as determined by the Contractor, certain parts of Subcontractor's Work shall be prosecuted in preference to others. The Subcontract Time shall be set forth in and subject to the Schedule.

The Subcontractor agrees that an earlier start date or later completion date resulting in changes to the progress of Subcontractor's Work, or that a later completion date attributable to delays and extensions of time resulting from Change Order(s) will not, without the prior written agreement of the Contractor and the Owner, be reason for additional compensation to the Subcontractor.

The Subcontractor's date of commencement is the date from which the Subcontract Time is measured; it shall be the date of this Agreement, as first written above, unless a different date is stated in a notice to proceed issued by the Contractor or the Owner. Unless the date of commencement is established by a notice to proceed issued by the Contractor, or visible Work has commenced at the site under the Prime Contract, the Subcontractor shall notify the Contractor in writing not less than five (5) days before commencing the Subcontractor's Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

### ARTICLE 12.    Delay, Extension of Time, and No Damage for Delay

Should Subcontractor be delayed, obstructed, hindered or interfered with in the commencement, prosecution or completion of Subcontractor's Work by any cause beyond Subcontractor's reasonable control, including but not limited to any act, omission, negligence or default of the Contractor or anyone employed by the Contractor, or by any other contractors or subcontractors on the Project, or by the Architect, the Owner or their contractors, subcontractors, agents or consultants, or by damage caused by fire or other casualty or by the combined action of workers or by governmental directive or order and nowise chargeable to Subcontractor, or by any extraordinary conditions arising out of war, terrorism, or governmental regulations or by any other cause beyond the reasonable control of and not due to default, neglect, act or omission of Subcontractor, its officers, agents, employees, subcontractors or suppliers, then (1) Subcontractor shall be entitled to an extension of time for a period equivalent to the time lost by reason of any and all of such causes; provided, however, that Subcontractor shall not be entitled to any such extension of time unless (a) Subcontractor gives the Contractor notice in writing of the cause or causes of such delay, obstruction, hindrance or interference within forty-eight (48) hours of the commencement thereof, (b) Subcontractor demonstrates that it could not have anticipated or avoided such delay, obstruction, hindrance or interference and has used all available means to minimize the consequences thereof, and (c)

**ARTICLE 16.    Assignment and Sub-subcontracting**

Subcontractor shall submit a complete list of material suppliers and subcontractors who are to perform any portion of Subcontractor's Work covered by this Subcontract within seven (7) days of the date of this Subcontract. The Subcontractor shall not assign this Subcontract or any amounts due or to become due hereunder without the written consent of the Contractor, nor subcontract this Subcontract, in whole or in part, without the written consent of the Contractor, which may be withheld by the Contractor in its sole discretion.

If the Subcontractor is providing design services as a part of this Subcontract, the Subcontractor shall be responsible for the design even though it has obtained outside consultants. Approval of the Subcontractor shop drawings does not constitute a waiver of this requirement.

**ARTICLE 17.    Compliance with Law and Permits**

The Subcontractor shall give notices and comply with laws, ordinances, rules, regulations and orders of public authorities bearing on performance of the Subcontractor's Work. The Subcontractor shall secure and pay for permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Subcontractor's Work, the furnishing of which is required of the Contractor by the Prime Contract.

The Subcontractor shall comply with Federal, state and local tax laws, social security acts, unemployment compensation acts and workers' compensation acts insofar as applicable to the performance of this Subcontract.

**ARTICLE 18.    Inspection of Premises**

It is understood and agreed by and between the parties hereto that all of the Subcontractor's manufacturing facilities, plants and production areas, and all areas of the Project occupied by the Subcontractor will be accessible to Contractor, the Architect and the Owner for inspection of any material to be incorporated into said Project.

**ARTICLE 19.    Overtime**

Contractor may, if it deems necessary, direct Subcontractor to work overtime and if so instructed, Subcontractor will work overtime. Contractor shall pay Subcontractor, provided that the Subcontractor is not in default under any of the terms or provisions of this Subcontract, or of any other Contract Documents, for the actual additional premium wages paid, plus taxes imposed by law on such additional wages. Premium time required so to complete Subcontractor's Work shall not be charged to Contractor unless authorized in writing by Contractor. No payment will be made for public liability insurance, overhead, supervisory services, profit or other charges. Invoices for premium time must show a breakdown of contributions, taxes and premiums paid under Federal, State and Local Laws by percentage; and if a percentage for Workmen's Compensation Insurance premiums as applied, evidence that such premiums are applicable must be submitted.

**ARTICLE 20.    Affirmative Action**

The Subcontractor will not discriminate against any employee or applicant because of race, color, religion, sex or national origin. The Subcontractor will take affirmative action to insure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion or transfer, recruitment advertising, layoff or termination, rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notice to be provided by an appropriate agency of the Federal Government setting forth the requirements of these nondiscrimination provisions.

**ARTICLE 21.    Interpretation of Plans and Specifications**

The Subcontractor agrees that the Architect is the interpreter of the requirements of the Contract Documents unless noted otherwise in the Contract Documents. The decisions of the Architect as to such interpretations shall be final.

**ARTICLE 22.    Payment of Wages**

The Subcontractor agrees to pay the wages and in all things to conduct Subcontractor's Work in the amount and at the times and in the manner provided for in and by all laws, ordinances, rules, regulations and orders governing or affecting the same. All terms, conditions, duties, liabilities, restrictions or obligations, created, imposed, incumbent or existing upon the Contractor by any law, ruling, regulation, code or proclamation of any and all commission, board, office, person or authority, Federal, State, County, Municipal or Local, now or hereafter affecting the subject matter of this Subcontract in any way, shall likewise apply to and fully govern and control the Subcontractor herein, and such Subcontractor hereby explicitly assumes and agrees to all such duties, liabilities and obligations and to the prompt and full performance of each of the same.
Revised 04/16/10

**ARTICLE 28.   Layout Engineering**

Unless otherwise provided, the Subcontractor agrees to provide all required layout and engineering necessary to perform Subcontractor's Work.

**ARTICLE 29.   Safety**

The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract.

The Subcontractor agrees to hold the Contractor, the Owner and the Project harmless for any and all violations by the Subcontractor, its employees, and subcontractors, or their employees of any state or federal law or regulation, including claims pertaining to the use of hazardous materials. Subcontractor shall indemnify the Contractor, the Owner and the Project for fines, penalties and corrective measures, and damages, and shall reimburse the Contractor for costs and expenses, including attorney fees, that result from acts of commission or omission by Subcontractor, its employees or subcontractors in failing to comply with such safety rules and regulations.

Subcontractor shall hold weekly "toolbox" safety meetings and shall furnish Contractor a copy of meeting minutes.

Subcontractor shall require its employees at the Site to wear and use safety and health equipment, to work in harmony with others working at the Site, and to comply with the Owner's, or the Contractor's regulations, and the rules and regulations imposed by law, covering working conditions. The Contractor shall have the right to furnish any safety or health equipment which Subcontractor fails to provide promptly, and Subcontractor shall upon demand pay the Contractor's cost thereof plus 20% for the Contractor's overhead and other indirect costs.

Subcontractor shall immediately report to the Contractor any unsafe conditions known to Subcontractor. Subcontractor, immediately after the occurrence of each accident involving injury to or death of any person or damage to property on the Site or in any way relating to Subcontractor's Work, shall deliver to the Contractor a report thereof, and other pertinent information which may include a copy of any accident report delivered to its insurance carrier.

If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Subcontractor, the Subcontractor's Sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other subcontractors and other employers on the site.

If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Subcontractor, the Subcontractor shall, upon recognizing the condition, immediately stop work in the affected area and report the condition to the Contractor in writing.

To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Subcontractor, the Subcontractor's subcontractors, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Subcontractor's Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described herein and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work or Subcontractor's Work itself) including loss of use resulting therefrom and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

**ARTICLE 30.   Clean-Up**

The Subcontractor shall, at its own cost and expense, (1) keep the Project including all roadways and drives free at all times from all waste materials, mud, packaging materials and other rubbish accumulated in connection with the execution of Subcontractor's Work, (2) clean and remove from the Subcontractor's Work and from all contiguous Work of others any soiling, staining, mortar, plaster, concrete or dirt caused by the performance of Subcontractor's Work, and make good all defects resulting therefrom, (3) at the completion of Subcontractor's Work in each area, perform such cleaning as may be required to leave the area "broom clean", and (4) at the entire completion of Subcontractor's Work, remove all of its tools, equipment, scaffolds, shanties and surplus materials. Should the Subcontractor fail to perform any of the foregoing to Contractor's satisfaction, the Contractor shall have the right to perform and complete such Subcontractor's Work itself or through others and charge the cost thereof to the Subcontractor.

| STATEMENT AND ACKNOWLEDGMENT | OMB No.: 9000-0014 Expires: 5/31/2011 |
|---|---|

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat, (VIR), Regulatory and Federal Assistance Division, GSA, Washington, DC 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0014), Washington, DC 20503.

### PART I - STATEMENT OF PRIME CONTRACTOR

| 1. PRIME CONTRACT NO. | 2. DATE SUBCONTRACT AWARDED | 3. SUBCONTRACT NUMBER |
|---|---|---|
|  |  |  |

| 4. PRIME CONTRACTOR | | 5. SUBCONTRACTOR | |
|---|---|---|---|
| a. NAME | | a. NAME | |
| Welty Building Company | | Gatlin Plumbing & Heating, Inc. | |
| b. STREET ADDRESS | | b. STREET ADDRESS | |
| 3421 Ridgewood Rd., Suite 200 | | 1111 East Main Street | |
| c. CITY | d. STATE / e. ZIP CODE | c. CITY | d. STATE / e. ZIP CODE |
| Fairlawn | OH  44333 | Griffith | IN  46319 |

6. The prime contract  [X] does,  [ ] does not contain the clause entitled "Contract Work Hours and Safety Standards Act – Overtime Compensation."

7. The prime contractor states that under the contract shown in Item 1, a subcontract was awarded on the date shown in Item 2 to the subcontractor identified in item 5 by the following firm:

a. NAME OF AWARDING FIRM

Welty Building Company

b. DESCRIPTION OF WORK BY SUBCONTRACTOR

HVAC Gas Line System

| 8. PROJECT | 9. LOCATION |
|---|---|
|  | 9301 Madison Street |
| Crown Point VA Clinic | Crown Point, IN 46307 |

| 10a. NAME OF PERSON SIGNING | 11. BY (Signature) | 12. DATE SIGNED |
|---|---|---|
| David W. Pyott | | |
| 10b. TITLE OF PERSON SIGNING | | |
| Project Manager | | |

### PART II - ACKNOWLEDGMENT OF SUBCONTRACTOR

13. The subcontractor acknowledges that the following clauses of the contract shown in Item 1 are included in this subcontract:

Contract Work Hours and Safety
Standards Act - Overtime
Compensation - (If included in prime contract see Block 6)
Payrolls and Basic Records
Withholding of Funds
Disputes Concerning Labor Standards
Compliance with Davis-Bacon and Related Act Regulations

Davis-Bacon Act
Apprentices and Trainees
Compliance with Copeland Act Requirements
Subcontracts (Labor Standards)
Contract Termination - Debarment
Certification of Eligibility

14. NAME(S) OF ANY INTERMEDIATE SUBCONTRACTORS, IF ANY

| | | | |
|---|---|---|---|
| A |  | C |  |
| B |  | D |  |

| 15a. NAME OF PERSON SIGNING | 16. BY (Signature) | 17. DATE SIGNED |
|---|---|---|
| 15b. TITLE OF PERSON SIGNING | | |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

**STANDARD FORM 1413** (REV. 7/2005)
Prescribed by GSA/FAR (48 CFR) 53.222(e)

Subcontract number: HVC 7563

# SUBCONTRACT AGREEMENT

*Between*

## Gatlin Plumbing & Heating, Inc.
1111 East Main Street
Griffith, Indiana 46319-2897
Telephone: (219) 924.6972  Facsimile Number:  (219) 924.1401
*(Subcontractor)*

*And*



**EXHIBIT**

**C**

## ROTH BROS., INC.
3847 Crum Road
Youngstown, Ohio 44515-0209
Telephone: (330)  793-5571 ; Facsimile Number:  (330)  793-5059
*(Roth)*

THIS AGREEMENT ("Agreement") is dated this **17th**  day of __January__  by and between **ROTH BROS., INC.** ("Roth") and __Gatlin Plumbing & Heating, Inc.__  ("Subcontractor"), and provides:

**1. Scope of Work; Contract Documents.**  Subcontractor shall furnish all labor, materials, equipment, tools, supplies and all other things necessary to complete diligently and timely the work identified in the attached Purchase Order for **VA Outpatient Clinic- Crown Point, IN** ("Project"). The Work is a portion of the work that Roth has agreed to perform under its contract ("General Contract") dated __January 17, 2011__  with **VA Outpatient Clinic**  ("Owner"). Subcontractor shall perform the Work in strict accordance with the Contract Documents identified in the attached Schedule B, which include, in addition to this Agreement, all agreements, plans, specifications, special and general conditions, addenda, bulletins and all modifications that are identified herein or are a part of the General Contract, all of which are incorporated in this Agreement by reference as if fully set forth herein. Subcontractor acknowledges that Roth has made the Contract Documents available for its inspection, and that Subcontractor has read those portions affecting its and Work and Subcontractor has made such site inspections as required to perform the Work. Subcontractor agrees to be bound to Roth by all terms of the Contract Documents that can apply to the Work, and hereby assumes toward Roth all the duties that Roth has to Owner under the Contract Documents. Roth shall have the same rights and privileges against Subcontractor as Owner has against Roth under the General Contract. This Agreement, the General Contract and all other parts of the Contract Documents are intended to supplement and complement each other, and shall be interpreted in that way whenever possible. If any provision of this Agreement irreconcilably conflicts with a provision of the General Contract or other Contract Documents, however, or if any of them conflict with one another, the provision imposing the greater duty or obligation on Subcontractor shall control.

**2. Performance Dates; Scheduling.**  Time is of the essence of this Agreement. Roth shall have the right to decide the time, priority and sequence in which Subcontractor shall perform and complete the various portions of the Work, and all other matters concerning the timely and orderly conduct of the Work. Subcontractor agrees to start when notified by Roth, to coordinate with others on the Project, and to perform the Work at the times and in the sequence that Roth directs. Subcontractor also agrees to perform the Work according to the project schedule and any revisions to it, so as not to delay, impede, obstruct, hinder or interfere with the start, progress or completion of the whole or any part of the Work or other work on the Project. Subcontractor agrees to complete the Work early enough to enable Roth to complete its work by the General Contract completion date, and in accordance with the project schedule. Subcontractor agrees to provide specific scheduling information, as Contractor requires.

Any modification of the completion date or other milestone dates, to be effective, must be in writing and signed by Roth. Subcontractor shall participate and cooperate in the development and updating of project schedules and other efforts to achieve timely completion of the Work. It shall provide, upon request, any information necessary for including its Work in such schedules, including information concerning the duration, manloading, and sequence of its activities. It shall continuously monitor the project schedules and be fully familiar with the timing, phasing and sequencing of the Work and of other work on the Project. Roth may require conferences at the job site. Subcontractor's authorized representative shall attend each such conference held while Subcontractor's work is underway and on such other occasions, as Roth requires.

If, in Roth's opinion, Subcontractor falls behind schedule, Subcontractor shall take all steps necessary to improve its progress, including, upon Roth's written direction, providing a recovery schedule, increasing its workforce and equipment, and procuring materials from others, all without additional cost to Roth. If Subcontractor delays the Work or other work on the Project directly, or through its subcontractors, suppliers, officers, agents, servants or employees, and such delay causes

causes additional costs, liability or damage to Roth or Owner, then Subcontractor agrees to reimburse Roth and Owner for and to indemnify them against the same. If Subcontractor delays the Work, whether or not such delay is excusable, Subcontractor shall, at its own cost, work such overtime (including holidays and weekends) as may be necessary to make up all time lost and to avoid delay in meeting the required milestone and completion dates. This obligation shall be in addition to all other obligations that the Agreement imposes in such circumstances. Subcontractor agrees that Roth has the right to early completion of the project.

Roth, at its discretion, may direct Subcontractor to work overtime, including weekends and holidays. Roth shall have no obligation to pay Subcontractor any premium time pay, or additional workmen's compensation or other insurance applied to premium pay, unless Subcontractor is in compliance with the Agreement at the time, and Subcontractor has obtained Roth's advance written approval of all overtime charges. In no event shall Roth be required to pay Subcontractor any additional overhead or profit based on or attributable to overtime.

**3. Delays.** Subcontractor shall be entitled to an extension of time for completion of the Work if Subcontractor is delayed by (1) any act, omission, neglect, or default of Roth, Owner, or anyone employed by Roth, Owner, or of any other contractor or subcontractor, (2) changes ordered in the Work, (3) unusually severe weather conditions, (4) fire, earthquake, natural disaster or other casualty, (5) late delivery of the site to Subcontractor, (6) delay in receiving material or equipment supplied by Roth or Owner, (7) failure by Roth or Owner to furnish change authorization, (8) defects in plans and specifications, (9) unexpected soil or other physical conditions, (10) suspension of work upon order of Roth or Owner, (11) the combined action of workmen in no way chargeable to Subcontractor, (12) any extraordinary conditions arising out of war or governmental regulations, or (13) any other cause beyond Subcontractor's control and not due in any way to any fault, neglect, act or omission on its part. If the alleged delay results from actions or inaction by Owner, or involves the correlative rights or duties of Owner, Subcontractor agrees to give Roth notice in the manner and within the time required by the General Contract, and to accept as its sole relief the amount of any actual additions allowed Roth by Owner, less any markup allowed for Roth's account, and any time extension actually allowed Roth by Owner. If the alleged delay does not result from action or inaction by Owner, or involve the correlative rights or duties of Owner, then Subcontractor shall receive an extension of time equal to the actual delay to critical activities caused by these delays, as determined by Roth. In that case, Subcontractor agrees that it waives all rights to a time extension under this Agreement, unless it presents a request for such time extension to Roth, in writing, within forty-eight (48) hours of the commencement of such claimed delay, Subcontractor agreeing that submission of such a request is an express condition precedent to Subcontractor's right to a time extension. An extension of time, as determined by Roth, or the decision that no extension of time shall be allowed, shall be Subcontractor's sole and exclusive remedy for delay. In exchange, Subcontractor waives any right it may otherwise have for damages due to or associated with any delay, including damages for inefficiency, disruption, acceleration, and extended overhead.

**4. Measurements; Drawings.** Notwithstanding the dimensions given on the plans, specifications or other Contract Documents, Subcontractor shall have the obligation to perform all layout for the Work and to take such measurements as may be necessary, including field measurements, to ensure the proper matching and fitting of the Work with contiguous work. At such times as designated by Roth, Subcontractor shall furnish to Roth drawings of a type and in a number specified by Roth, including, but not limited to, drawings relating to the method and manner of performance hereunder and interference drawings. By requesting or receiving such drawings, Roth shall not relieve Subcontractor of performing in accordance with the provisions of this Agreement.

**5. Condition of Premises; Supervision; Miscellaneous Services.** Subcontractor shall at its own cost (1) keep the premises free from all waste materials, packaging materials and other rubbish accumulated in connection with the execution of its Work by collecting and depositing said materials and rubbish in locations or containers designated by Roth, then removing them from the premises without charge to Roth, (2) clean and remove from its own Work and from all contiguous work of others any soiling, stains, mortar, plaster, concrete or dirt caused by Subcontractor, its agents and employees, in the execution of this Work, and make good all defects resulting therefrom, (3) at the completion of its Work in each area, perform such cleaning as may be required to leave the area "broom clean," and (4) at the completion of its Work under this Agreement, remove all of its tools, equipment, scaffolds, shanties and surplus materials. If Subcontractor fails to perform any of the foregoing to Roth's satisfaction, it authorizes Roth to perform and complete such Work itself or through others and to charge to Subcontractor the direct cost and an additional 15% for Roth's administrative costs.

Subcontractor shall act as an independent contractor, shall provide adequate supervision of the work, and shall have a competent foreman or superintendent satisfactory to Roth on the Project at all times, with full authority to act for Subcontractor. Subcontractor shall furnish all lighting, temporary heat, power, temporary offices, water, watchmen, ice water, sanitary facilities, dewatering equipment, quality control and testing, storage facilities, temporary roads and temporary parking as may be required for Subcontractor's Work. Subcontractor shall be responsible for picking up, unloading and hoisting all of its materials, supplies, and tools, and for supplying all equipment, including scaffolding, scissor lifts and high reaches, to ensure the timely completion of the Work. Subcontractor shall perform all demolition, cutting, removal and replacement of existing architectural to accommodate installation of its Work. Subcontractor will work during the normal project working hours unless specific authorization is provided by Roth's superintendent or required by the contract requirements

**6. Compliance with Law.** Subcontractor shall obtain and pay for all necessary permits, licenses and inspections pertaining to the Work and shall comply, at its expense, with all federal, state, municipal and local laws and other legal requirements, including equal employment opportunity provisions, ordinances, rules, regulations, orders, or practices, and with the requirements of the Board of Fire Underwriters, whether or not provided for by plans, specifications, general conditions or other Contract Documents, without additional charge or expense to Roth. Subcontractor shall also be responsible for, and correct at its expense, any violations resulting from or concerning the performance of its obligations hereunder. Subcontractor shall furnish, upon demand, such proof as Roth may require at any time showing such compliance and the correction of any violations. As part of the foregoing, Subcontractor specifically agrees to comply with the Federal Standard on Hazard Communication, found in 29 CFR 1910.1200, and to forward to Roth copies of all Material Safety Data Sheets on all hazardous and toxic substances, as that standard requires. Subcontractor also agrees, at its expense, to comply with all applicable laws and governmental regulations relating to the occupational safety and health of employees, specifically including the Federal Occupational Safety and Health Act of 1970 and any rules, regulations, standards or orders issued thereunder. Subcontractor also certifies that it will provide a drug-free workplace for its employees during performance of the Work.

In addition to the foregoing, Subcontractor shall at its own expense comply with all applicable federal, state and local laws, ordinances, rules and regulations concerning equal opportunity and non-discriminatory practices, including but not limited to the Civil Rights Act (Title VII) of 1994, The Federal Equal Pay Act, the Age Discrimination in Employment Act, The Americans with Disabilities Act of 1990, and 41 CFR 60 and subparts concerning employment of minorities, females, disabled workers, and disabled and Vietnam Era Veterans. Subcontractor shall be familiar with Roth's published policy prohibiting sexual harassment and will publish and enforce a policy that is at least as strict.

Subcontractor agrees to indemnify and save Roth harmless from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs of compliance, consequential damages or any other costs, including legal fees and disbursements, caused or occasioned directly or indirectly by Subcontractor's actual or alleged violations or non-compliance with the requirements of this paragraph.

**7. Price, Progress Payments.** In exchange for Subcontractor's satisfactory performance and completion of the Work and of all its duties under this Agreement, Roth agrees to pay Subcontractor **$ 363,000.00** ("Subcontract Price"), subject to additions and deductions, as provided in this Agreement. The Subcontract Price includes all applicable federal, state and local taxes, which shall be stated separately if so required by law, and Subcontractor accepts exclusive liability for all sales or use tax which may be assessed against materials, equipment or labor used for the Work or which may arise out of this Agreement.

Subcontractor shall, within 15 days of execution of this Agreement and before the first pay period, submit to Roth for its approval an itemized schedule of values of work to be performed. Four days before the last day of each month, or earlier, if Roth requests, Subcontractor shall submit a written requisition for payment, in a form and supported by such information as Roth may require. The monthly requisition shall show the proportionate value of Work performed to that date, based on the approved schedule of values, including any and all additional work not originally required by this Agreement, except that such additional work shall not be included unless and until Roth agrees in writing to the performance and cost thereof. Payment shall be due for the value of Work shown on the requisition, to the extent approved by Roth and Owner, and after deducting (a) all previous payments, (b) retention equal to 10% of the total value performed to date, and (c) all charges or backcharges for services, material and equipment furnished by Roth to or chargeable to Subcontractor. In no event, however, shall Roth have any obligation to pay Subcontractor any part of said requisition before Roth receives payment for the Work encompassed by that requisition from Owner, Subcontractor agreeing that Roth's receipt of such payment from Owner is an express condition precedent to Roth's obligation to pay Subcontractor. No payment to Subcontractor, either progress payments or final payment under Paragraph 8, shall operate as an approval of Subcontractor's Work or any part thereof. Subcontractor shall promptly pay all of its subcontractors for work performed and its suppliers for materials supplied, shall pay all workmen each week, and shall keep the Project and the land on which it is located free and clear of all mechanic's liens that may arise by reason of the Subcontractor's Work. Subcontractor shall, at Roth's request, furnish a sworn statement showing all parties who furnished labor or materials to Subcontractor, with their names and addresses and the amounts due or to become due, and furnish a copy of its certified payroll for the Project. Roth may withhold payment of any requisition until Subcontractor has furnished evidence that it has paid in full for all labor, materials and supplies used in the Work through the date of the requisition. This Agreement incorporates the clauses required by 31 U.S.C.A. § 3905, if the Project is subject to its provisions, and those clauses shall govern in case of any conflict with the provisions of Paragraph 7 or Paragraph 8 of this Agreement.

**8. Final Payment.** Final payment, consisting of the unpaid balance of the Subcontract Price, shall be due within thirty (30) days after the last of the following conditions precedent to payment occur: (1) completion and acceptance of the Work by Roth and Owner, (2) receipt by Roth of final payment for Subcontractor's Work from Owner, (3) Subcontractor's furnishing of evidence satisfactory to Roth that there are no claims, obligations or liens outstanding or unsatisfied for labor, services, materials, equipment, taxes or other items performed, furnished or incurred for or in connection with the Work, and (4) Subcontractor's execution and delivery of a General Release, in a form satisfactory to Roth, running to and in favor

of Roth and Owner. Subcontractor specifically agrees that Roth shall have no obligation to make final payment, unless and until Roth receives payment therefor from Owner, because Roth's actual receipt of such payment from Owner is an express condition precedent to Roth's obligation to pay Subcontractor. If Roth learns of any claim, obligation or lien arising out of Subcontractor's Work, after making final payment, Subcontractor shall refund to Roth all monies that Roth and Owner pay in satisfying, discharging or defending against any such claim, obligation or lien or any action brought or judgment recovered thereon and all costs, including legal fees, plus 15% of the amount paid, for Roth's administrative costs. No payment under this Agreement, including final payment, shall be conclusive evidence that Subcontractor has performed the work in accordance with the Agreement, or be construed as acceptance of any defective or faulty work, equipment or materials. Roth shall have the right to withhold payment for any requisition or final payment that is then due or shall become due, if any of the following occurs: (1) any claim or lien is made or filed with or against Roth, Owner, or the Project by any person claiming that Subcontractor or any subcontractor or other person under it has failed to make any type of payment, (2) Roth receives evidence of nonpayment or of any claim or lien for which Roth or Owner might become liable and which may be chargeable to Subcontractor, (3) Subcontractor or any subcontractor or other person under it causes damage to the Work or to any other work on the Project, or (4) Subcontractor fails to perform or is in default under any term or provision of this Agreement. Roth shall have the right to withhold from payment an amount that Roth deems sufficient to (a) satisfy, discharge and/or defend against any such claim or lien, or any action which may be brought or judgment which may be recovered thereon, (b) make good any Subcontractor nonpayment, damage, failure or default, and (c) compensate Roth and Owner for and indemnify them against any and all losses, liability, damages, costs, including legal fees and disbursements, plus an additional 15% of the amount Roth or Owner expends in performing under (a) and (b) hereof. Roth shall have the right to apply and charge against Subcontractor so much of the amount withheld as may be required for the foregoing purposes.

Roth shall not be responsible for any loss or damage to Subcontractor, no matter what the cause, until after final acceptance of the Work by Roth and Owner, nor shall Roth be responsible for loss or damage, however caused, to materials, tools, equipment, appliances or other personal property owned, rented or used by Subcontractor or anyone employed by it in the performance of the Work.

**9. Extra Work and Additional Compensation.** Subcontractor acknowledges that it has conducted all examinations necessary to satisfy itself as to the nature and location of the Work, the character, quantity and kinds of materials to be encountered, and the location, conditions and other matters that can affect the Work. Roth agrees to compensate Subcontractor for any extra Work performed by Subcontractor pursuant to subparagraphs 9(A) or 9(B) of this Agreement, but only where Roth agrees to and does expressly authorize such extra Work in writing, and such writing, including all daily work tickets therefor, is signed by an agent of Roth with actual authority to do so. This requirement for written approval of extra work is not subject to oral modification or waiver.

   A. Changes Initiated by Owner. The Owner has the right under the General Contract to require Roth to make changes in the Work, including additions and deletions. If Owner makes such changes, Roth may require Subcontractor to make corresponding changes to the Work, without invalidating this Agreement, to the same extent and in such manner as Owner may require of Roth under the General Contract. Upon Roth's request, and in any case within such time as to enable Roth to comply with its obligations under the General Contract, Subcontractor shall submit a written proposal for any applicable adjustment to the Subcontract Price or extension of time in such detail as Roth may require. Subcontractor agrees to accept as full compensation or deduction for any changes initiated by Owner (1) the amount of any actual additions allowed Roth or deductions taken from Roth by Owner, less any markup allowed for Roth's account, and (2) any time extension actually allowed Roth by Owner. If Roth directs Subcontractor in writing to proceed with any Owner changes, Subcontractor agrees to commence and complete performance expeditiously, and despite any disagreement concerning compensation for such changed work.

   B. Changes Initiated by Roth. Roth may change the Work through an authorized agent with actual authority, without invalidating this Agreement, and such changes may include additions and deletions. Subcontractor agrees to perform such changes. Within ten (10) days after receipt of Roth's request, Subcontractor shall submit a written proposal for any adjustment to the Subcontract Price or extension of time due to any change. If Roth and Subcontractor cannot agree in writing to the adjustment or extension, Roth may direct Subcontractor in writing to perform the change, pending resolution of the proper adjustment or extension, and Subcontractor shall immediately do so. Subcontractor shall be entitled to an equitable adjustment for the cost and a time extension, taking into consideration the actual and reasonable cost of necessary labor and material, plus 10 % overhead and profit. Subcontractor agrees that it shall not be entitled to any payment for loss of efficiency due to any changes, or to overhead or profit attributable to the premium portion of labor costs. If Roth directs Subcontractor in writing to proceed with any changed work, Subcontractor agrees to commence and complete performance expeditiously, and despite any disagreement concerning compensation for such changed work.

**10. Guarantees and Warranties.** Subcontractor hereby warrants and guarantees that all materials and equipment furnished and incorporated into the Project is new and of good quality, and that the Work is free from defects in workmanship and materials, and conforms to the plans and specifications in the Contract Documents. Subcontractor further warrants and guarantees the Work to the full extent provided in the plans, specifications, general conditions and other Contract Documents. At the completion of the Work, Subcontractor shall provide written guarantees, warranties, bonds and assurances, if any are required of Roth by Owner under the General Contract.

Without limiting the foregoing or any other liability or obligation with respect to the Work, Subcontractor shall, at its expense and because of its express warranty, make good any faulty, defective, or improper parts of the Work discovered within one year from the date of acceptance of the Project as a whole by Owner, or within such longer period as may be provided by other Contract Documents. In addition, as to any defect not readily discoverable upon visible inspection, Subcontractor further agrees to extend its agreement to make good any faulty, defective, or improper parts of the Work for a period of one (1) year from the date that the defect becomes manifest and readily visible without dismantling or such longer period as required by the contract.

Subcontractor agrees to pay all damages, direct and consequential, sustained by Roth or Owner due to defects in the Work or Subcontractor's failure to perform in accordance with this Agreement, and all costs necessary to correct, remove, replace and/or repair the Work and any other work or property which may be damaged in correcting, removing, replacing or repairing any work.

**11. Safety; Protection of Work.** As an expert in the field, Subcontractor is solely responsible for the health and safety of its employees, agents, subcontractors and other persons under its directions on or adjacent to the Project, and Roth shall have no responsibility for such matters. Subcontractor agrees that it will take all necessary and prudent safety precautions during its performance under this Agreement, and will, at a minimum, comply with all safety policies, programs and measures initiated by Roth or Owner, including substance abuse testing, and with all applicable legal requirements, as provided in Paragraph 6. Subcontractor shall also designate a competent safety representative who is experienced and capable of identifying existing and predictable hazards in the surroundings or working conditions that are unsanitary, hazardous, or dangerous to employees or the public, and who has authorization to take immediate corrective measures to ensure the safety of Subcontractor's work areas. Subcontractor shall submit a site-specific safety plan to Roth for review before starting work on the Project. Subcontractor shall report to Roth any injury to Subcontractor's employees or an employee of any subcontractor, within a day of its occurrence, and promptly submit OSHA Form No. 101 or equivalent and an accident investigation report. If Subcontractor fails to correct any unsafe procedures, acts or conditions, within twenty-four (24) hours of written notice, Roth may but shall not have the obligation to correct it and to charge the cost to Subcontractor, including an additional 15% for Roth's administrative costs.

Subcontractor shall take all necessary precautions to protect the work of others from any damage caused by Subcontractor's operations, and shall watch over, care for and protect from theft, damage, or injury, by any cause whatsoever, all of Subcontractor's Work, complete or otherwise, and all of its materials, supplies, tools and equipment at or near the Project. Subcontractor shall make good any loss or damage to any and all such Subcontractor's Work, materials, supplies, tools, and equipment until final acceptance of the entire Project by Owner.

**12. Indemnity, Insurance; Bonds.** For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including the first $1,000 of the Subcontract Price, Subcontractor hereby assumes the entire responsibility and liability for any damage or injury of any kind to persons (including death resulting therefrom), whether employees of Subcontractor or otherwise, and to property, which is caused by, results from, arises out of, or occurs in connection with performance of the Work by Subcontractor or anyone acting through it. Subcontractor agrees to indemnify and save harmless Roth and Owner, their officers, agents, servants and employees (jointly the "Indemnitees") from and against any and all claims concerning damage or injury to persons (including death resulting therefrom) or to property, whether or not such claims are based in part on Indemnitees' alleged active or passive negligence or participation in the wrong, or on their alleged breach of a statutory duty or obligation. Subcontractor further agrees to indemnify and hold Indemnitees harmless from and against liability, loss, damage, or expense, including legal fees, arising out of or related to any claim, action, or proceeding brought against Indemnitees involving the manner or sufficiency of Subcontractor's performance of the Work, including Subcontractor's breach of warranties or guarantees, and whether or not damage to persons or property is involved. Subcontractor also hereby agrees to assume, on behalf of Indemnitees, the defense of any claim, action, or proceeding that is brought against any of them, and to pay them upon demand of any of them the amount of any judgment that may be entered against them, individually, jointly or severally. Roth shall have the right to withhold from any payments due or to become due to Subcontractor an amount sufficient in its judgment to protect Indemnitees from and against any asserted or threatened claim, action, or proceeding, or Roth in its discretion may require Subcontractor to furnish a surety bond satisfactory to Roth guaranteeing such protection, which Subcontractor shall furnish within five (5) days after written demand is made.

Subcontractor hereby agrees to waive all claims of any kind against Roth, including claims for personal injury or property damages, arising out of or related to the use by Subcontractor's personnel of Roth's materials, scaffolding equipment, machines, tools, or any other type of property (jointly "Roth's Property"), whether such use was a gift, exchange, rental, loan,

loan, or any other type of arrangement. Subcontractor further agrees that its personnel using Roth's Property shall be considered to be subject to Subcontractor's direction and control, and, as between them, Subcontractor, not Roth, shall be considered liable for such personnel's acts, failures to act, omissions, negligence, or fault. Subcontractor also hereby agrees to indemnify and hold Roth harmless against any liability, loss, damage, or expense arising out of or related to any claim, suit, action, or proceeding brought because of such use of Roth's Property, whether or not it is based in part on Roth's alleged active or passive negligence or participation in the wrong. Subcontractor's indemnity obligations are in addition to the insurance obligations set forth below.

Before starting the Work, Subcontractor shall procure and maintain, at its own expense, until completion and final acceptance of the Work, all insurance of the types and in the amounts provided in the General Contract, including at least the following, from insurance companies satisfactory to Roth and Owner:

1.  WORKMEN'S COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE in accordance with the laws of the State in which the Work is performed.

2.  CONTRACTOR'S PUBLIC LIABILITY INSURANCE INCLUDING CONTRACTUAL LIABILITY INSURANCE AGAINST THE LIABILITY ASSUMED HEREINABOVE, and including CONTRACTORS' PROTECTIVE LIABILITY INSURANCE if Subcontractor sublets to another all or any portion of the Work, with the minimum limits as set forth in the General Contract, but if none is set forth therein, with such minimum limits as Roth shall set.

3.  AUTOMOBILE LIABILITY INSURANCE, covering all owned, non-owned and hired automobiles used in connection with the Work, with the minimum limits as set forth in the General Contract, but if none is set forth therein, with such minimum limits as Roth shall set.

Each policy, except the policy for workmen's compensation, shall include an endorsement from insurance company naming Roth as an additional insured, with no right of contribution or subrogation against Roth or its insurer. Before starting Work, Subcontractor shall furnish a certificate, satisfactory to Roth, from each insurance company showing that the above insurance is in force, stating policy numbers, dates of expiration, and limits of liability thereunder, and providing that the insurance will not be canceled or changed until at least thirty (30) days after written notice of such cancellation or change has been mailed to and received by Roth.
If Subcontractor fails to procure and maintain such insurance, Roth shall have the right to procure and maintain the said insurance for and in the name of Subcontractor. Subcontractor shall pay the cost of such insurance, and shall furnish all necessary information to make effective and maintain such insurance.

If requested, Subcontractor shall furnish Roth with a performance bond in the amount of the Subcontract Price and a separate payment bond in the amount of Subcontract Price. The form and contents of such bonds, and the Surety or Sureties thereon shall be subject to Roth's approval. No payments shall be due under this Agreement until Subcontractor has furnished the bonds requested by Roth.

**13. Termination For Convenience.** Roth has the right at any time by written notice to Subcontractor to terminate this Agreement without cause, for its convenience or because of Owner's termination of the General Contract, and require Subcontractor to cease work hereunder. In that event, and only if Subcontractor is not then in default, Roth shall pay Subcontractor pursuant to the terms of this Agreement for all work properly performed as of the date of the termination, reasonable costs of demobilization, and other reasonable costs that Subcontractor incurs as a direct result of the termination. Subcontractor agrees that it shall be entitled to profit only on the portion of the Work that it actually and properly performs and that is approved for payment as of the date of termination, and waives any claim for loss of anticipated profits on Work not performed. If such termination for convenience results from a termination by Owner, Subcontractor agrees to comply with the terms of the Contract Documents concerning the termination, and to accept as full compensation the amount of any actual additions allowed Contractor by Owner for Subcontractor, less any markup allowed for Contractor's account.

**14. Claims; Dispute Resolution.** Subcontractor shall submit all claims for extra cost for whatever cause through Roth for transmittal to Owner, and shall do so within the time and in the manner set forth in the General Contract but not less than 10 days after the event that gives rise to the claim. Subcontractor agrees that Roth shall not be liable to Subcontractor for an amount greater than the amount that Roth actually receives from Owner for such claim, less Roth's normal overhead and profit. If Roth and Subcontractor have a dispute arising under or relating to this Agreement or its breach, which involves the correlative rights or duties of Owner, such dispute shall be decided in accordance with the General Contract. Subcontractor agrees that it will give Roth notice of any such dispute in the manner required by the General Contract, and within such time as to enable Roth to comply with its obligations under the General Contract. Subcontractor and its surety, if any, shall be bound to Roth to the same extent that Roth is bound to Owner by the terms of the General Contract, and by any decisions or determinations made under the General Contract by any authorized person, board, court, or other tribunal. Subcontractor shall have a reasonable opportunity to present information and testimony involving its rights in such dispute, and shall cooperate with Roth in and bear its proportionate cost of presenting any claim.

In the event Subcontractor's claim is the sole claim being presented, then Subcontractor will pay for all costs associated with pursuing its claim and agrees to pay 10 % of any awarded amount to Roth. If Roth and Subcontractor have a dispute arising under or relating to this Agreement, but which does not involve the correlative rights and duties of Owner, and is not, therefore, controlled by the foregoing provision, then Subcontractor agrees to give Roth notice within ten (10) days of when it first arises, or else Subcontractor waives all rights to claim additional compensation or a time extension for it. If Subcontractor gives Roth the required notice, then either party may seek to resolve the dispute in any court having jurisdiction over this Agreement. Subcontractor agrees to continue working despite any dispute, and agrees that failure to do so will act as a waiver of all of its rights under this Agreement.

**15. Breach of Agreement, Failure to Perform, Remedies.** Subcontractor shall be in default of this Agreement if it does any of the following: (1) refuses or neglects to supply sufficient skilled workmen, or materials of the proper quality and quantity, or fails in any respect to perform and prosecute the Work properly and with promptness and diligence; (2) fails to pay payroll in full when due; (3) fails to commence correction of faulty work within four days after receipt of written notice to proceed; (4) fails in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents; (5) files a petition in bankruptcy for an arrangement or reorganization or has one filed against it; (6) becomes insolvent or is adjudicated bankrupt; (7) goes into liquidation or dissolution, either voluntarily or involuntarily, or under a court order; or (8) makes a general assignment for the benefit of creditors, or otherwise acknowledges insolvency. If Subcontractor is in default, Roth shall have the right, after three (3) days written notice to Subcontractor mailed or delivered to its last known address, to (a) perform and furnish itself or through others all or any portion of the Work, and to deduct the cost from any monies due or to become due under this Agreement, and/or (b) terminate Subcontractor's employment for all or any portion of the Work. If Roth terminates Subcontractor's employment, then, to complete all or any portion of the Work, it may enter upon the premises and take possession of all materials, equipment, scaffolding, tools, appliances and other items thereon, all of which Subcontractor hereby transfers, assigns and sets over to Roth for such purpose. In such case, Roth may also employ any person or persons to complete the Work or any portion of it, and provide all the labor, services, materials, equipment and other items required. In case of such termination of employment, Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work is wholly completed to the satisfaction of Roth and Owner, and has been accepted by them. If such costs exceed the unpaid balance, then Subcontractor shall pay the difference to Roth. Roth's termination costs for which Subcontractor shall be liable shall include the cost of completing the Work, and of all other resulting losses, damages and costs, including legal fees, plus an additional 15% for Roth's administrative costs. Roth's rights under this Paragraph 15 shall be in addition to any other rights under this Agreement, other Contract Documents, or the law. If, after termination pursuant to this paragraph, it is determined for any reason that Subcontractor was not in default, the rights and obligations of the parties shall be the same as if the Notice of Termination had been issued for Roth's convenience pursuant to Paragraph 13 of this Agreement.

If, because of a bankruptcy proceeding, the Subcontractor, a trustee, or any court is authorized to decide whether the Subcontractor will either reject this Agreement or affirm it and provide adequate assurances of Subcontractor's ability to perform, Roth may take any steps that it deems necessary to maintain the project schedule while awaiting such decision.

**16. Miscellaneous.** If the General Contract requires Roth to include certain clauses in its subcontract agreements on the Project, then such clauses are hereby included herein as if fully set forth, and Subcontractor agrees to be bound by them. Subcontractor also agrees to insert such clauses into any subcontracts it enters with others. This Agreement constitutes the entire agreement between the Roth and Subcontractor. This Agreement supercedes any purchase order, contract or other agreement made before this Agreement, and covering or pertaining to the Work. Roth has made no oral representations or any other agreements, except as stated in this Agreements. The parties may not change this Agreement in any way, except as herein provided. Roth shall not be deemed to have waived any term or provision hereof, except in writing, signed by its duly authorized officer or agent. This Agreement and the Subcontractor are subject to Owner's approval, without which this Agreement shall be null and void. The paragraph headings in this Agreement are for convenience only, and do not limit or define the scope or intent of this Agreement or any paragraph hereof. If any provision or part of the Contract Documents are held to be void or unenforceable, the remaining provision shall continue to be valid and binding upon Roth and the Subcontractor, and the Contract Documents shall be reformed to replace the stricken provision with a valid and enforceable provision that comes as close as possible to expressing the intent of the stricken provision. This agreement shall be construed with the laws of the state in which the Project is located.

Roth and Subcontractor, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all of the terms and provisions herein contained.

The following list of attachments are included and made a part of this subcontract:
Schedule A:      Scope of Work – Purchase Order # HVC 7563
Schedule B:      Project Schedule
Insurance Requirements for Roth Bros. Subcontractors

IN WITNESS WHEREOF the parties to this Agreement have hereunto set their hands as of the day and year first above written.

Attest:

**ROTH BROS., INC.**

By _____
   **Thomas E. Froelich**
   **Executive Vice President**

**Gatlin Plumbing & Heating, Inc.**

Attest:

By _____   Sec. / Treas.
   (Officer's Name/Title)

# Statement

*Gatlin Plumbing & Heating, Inc.*
*1111 East Main Street*
*Griffith, IN  46319-2897*
Phone: (219) 924-6972
Fax: (219) 924-1401
Email: gatlinplumbing@comcast.net



Since 1938

Indiana Plumbing License #81009039

**Statement Date:**  2/1/2012

**Customer Number:**  RO10107

Roth Bros., Inc.
3847 Crum Road
P.O. Box 4209
Youngstown, OH  44515-0209

| Date | Reference | Description | Charge | Credit | Balance |
|---|---|---|---|---|---|
| 3/16/2011 | R54231-IN | V.A.Clinic-Crown Point, IN | 10,115.00 | | 10,115.00 |
| 3/29/2011 | R54293-IN | V.A. Clinic-Corwn Point | 4,580.00 | | 4,580.00 |
| 4/27/2011 | R54471-IN | VA Clinic, Crown Point | 7,679.00 | | 7,679.00 |
| 5/31/2011 | R54679-IN | VA Clinic Crown Point | 12,673.00 | | 12,673.00 |
| 6/30/2011 | 0054966-IN | VA Clinic Crown Point | 8,027.00 | | 8,027.00 |
| 6/30/2011 | R54966-IN | VA Clinic Crown Point | 892.00 | | 892.00 |
| 7/28/2011 | 0055128-IN | VA Clinic-Crown Point | 6,344.00 | | 6,344.00 |
| 7/28/2011 | R55128-IN | VA Clinic-Crown Point | 705.00 | | 705.00 |
| 8/24/2011 | 0055318-IN | VA Clinic-Crown Point | 5,400.00 | | 5,400.00 |
| 8/24/2011 | R55318-IN | VA Clinic-Crown Point | 600.00 | | 600.00 |

|  |  |  |  | **Total:** | **57,015.00** |
|---|---|---|---|---|---|

| Current | 30 Days | 60 Days | 90 Days | 120 Days | Balance Due |
|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 57,015.00 | 57,015.00 |

TERMS: NET 30 DAYS. 1-1/2% MONTHLY SERVICE CHARGE ON ALL PAST ACCOUNTS



EXHIBIT
D

# Statement

*Gatlin Plumbing & Heating, Inc.*
*1111 East Main Street*
*Griffith, IN 46319-2897*
Phone: (219) 924-6972
Fax: (219) 924-1401
Email: gatlinplumbing@comcast.net

Welty Building Company Ltd.
3421 Ridgewood Road
Suite 200
Fairlawn, OH 44333



**Since 1938**

**GPH**

**Indiana Plumbing License #81009039**

Statement Date: 2/1/2012

Customer Number: WE11004

| Date | Reference | Description | Charge | Credit | Balance |
|------|-----------|-------------|--------|--------|---------|
| 4/8/2011 | R54379-IN | V.A. Clinic, Crown Point, IN | 828.00 | | 828.00 |
| 4/28/2011 | R54491-IN | VA Clinic - Crown Point | 1,211.00 | | 1,211.00 |
| 5/31/2011 | R54733-IN | VA Clinic  Crown Point | 1,381.00 | | 1,381.00 |
| 7/28/2011 | 0055103-IN | VA-Crown Point | 15,493.00 | | 15,493.00 |
| 7/28/2011 | R55103-IN | VA-Crown Point | 1,721.00 | | 1,721.00 |

| | | | | Total: | 20,634.00 |
|---|---|---|---|---|---|

| Current | 30 Days | 60 Days | 90 Days | 120 Days | Balance Due |
|---------|---------|---------|---------|----------|-------------|
| 0.00 | 0.00 | 0.00 | 0.00 | 20,634.00 | 20,634.00 |

TERMS: NET 30 DAYS. 1-1/2% MONTHLY SERVICE CHARGE ON ALL PAST ACCOUNTS



**EXHIBIT**

E